**NOBLE ENERGY, INCORPORATED, a Delaware corporation, successor by merger to Noble Energy Production, Incorporated, a Delaware corporation, successor by merger to Patina Oil & Gas Corporation, a Delaware corporation, Plaintiff–Appellee,**

v.

**COLORADO DEPARTMENT OF REVENUE; and Roxanne Huber, in her official capacity as Executive Director of the Colorado Department of Revenue, Defendants–Appellants.**

No. 09CA0426.

Colorado Court of Appeals, Div. III.

April 15, 2010.

Davis Graham & Stubbs, LLP, Scot W. Anderson, Andrea Wang, Peter Rose, Denver, Colorado, for Plaintiff–Appellee.

John W. Suthers, Attorney General, Robert H. Dodd, Jr., Assistant Attorney General, Denver, Colorado, for Defendants–Appellants.

Martens, Seay & Todd, James F. Martens, Austin, Texas; Jester, Gibson & Moore LLP, Thomas Gibson, Denver, Colorado, for Amicus Curiae BJ Services Company.

Opinion by Judge RICHMAN.

The Colorado Department of Revenue (the department) and Roxanne Huber, in her capacity as Executive Director of the department, appeal the judgment in favor of Noble Energy, Inc. (taxpayer) for a refund of sales taxes. We affirm in part, reverse in part, and remand for further proceedings.

## I. Background

The basic facts are undisputed. Taxpayer hired oil and gas well service companies to "fracture" wells that it operated in Colorado during the taxable period—April 2002 through July 2005. Fracturing is a method of well stimulation whereby a fracturing fluid and "proppant" are forced, under high pressure, into a well to create fractures in the hydrocarbon-producing formation. "Proppant" may be natural sand or an artificial material, but to maintain consistency with

the record in this case, we will refer to proppant simply as "sand." The fracturing fluids are thereafter removed and disposed of as a waste product by taxpayer. The sand remains lodged in the underground formation, propping open the fractures and allowing oil and gas to flow more easily to the wellbore.

In the transactions at issue, the fracturing companies provided personnel, equipment, expertise, and materials for each fracturing job and charged sales tax to taxpayer on the materials—the fluids and sand. All the fracturing companies charged sales tax on the fracturing materials. Some invoices were itemized—listing the quantities and prices of the materials used, and adding a charge for "sales tax" based on the stated price for them. Other invoices listed the quantities of the materials, a net amount "as per agreement," and a separate charge for "sales tax."

In Colorado, sales tax shall be collected and paid on "the purchase price paid or charged upon all sales and purchases of tangible personal property at retail." § 39–26–104(1)(a), C.R.S.2009. Taxpayer filed for a refund of the sales tax it paid on the charges for the materials, arguing that there was no purchase of tangible personal property.

Taxpayer also applied for an unrelated refund of sales tax it paid on its purchase of separators—pieces of equipment which separate the well stream into water, oil, and deliquified natural gas—pursuant to section 39–26–709(1)(a)(II), C.R.S.2009, which provides that "purchases of machinery or machine tools, or parts thereof, in excess of five hundred dollars to be used in Colorado directly and predominantly in manufacturing tangible personal property, for sale or profit" shall be exempt from sales taxation.

The department denied both claimed refunds, and taxpayer filed a timely protest, which was also denied. See § 39–21–104, C.R.S.2009. After conducting a hearing, the department issued a final determination denying taxpayer's claims.

Taxpayer appealed to the district court for a de novo trial. See § 39–21–105, C.R.S. 2009. The court first granted taxpayer's motion for summary judgment as to the imposition of sales tax on the sand and the separators. The court found that because "the sand used in the fracturing job becomes permanently lodged deep underground in the fractures created·by the fracturing" and "remains embedded in the soil," it is "clearly a part of the realty, and is removable only with substantial damage to the premises." Therefore, the court concluded that the sand used in the fracturing process does not meet the department's own definition of tangible personal property. See § 39–26–102(15), C.R.S. 2009. The court ruled that the separators were exempt from sales tax liability as "machinery or machine tools ... used in Colorado directly and predominantly in manufacturing tangible personal property," pursuant to section 39–26–709(1)(a)(II).

After a one-day trial, the court determined, as to the remaining issues, that (1) in the fracturing transactions at issue, the goods and services components were "inseparable," (2) the "true object" of taxpayer was to obtain services which enhance the productivity of the wells, and not to acquire fracturing materials used in stimulating the wells, and (3) any tangible personal property transferred to taxpayer as part of the fracturing was "incidental" to the fracturing service, and thus not taxable to taxpayer. These conclusions provided an alternative basis for ruling that the sand was not taxable to taxpayer, even if it were tangible personal property. The court entered a judgment in favor of taxpayer for a refund of $2,820,338.72 plus interest. The department filed this appeal.

## II. Issues on Appeal

The department argues that the district court erred in holding that (1) the fracturing materials are inseparable from the service provided by fracturing companies and therefore not subject to sales tax, (2) the sand used for fracturing jobs does not meet the statutory definition of tangible personal property, and (3) the separators are exempt from tax liability.

### A. Standard of Review

■ Pursuant to section 39–21–105(2)(b), C.R.S.2009, when a taxpayer appeals the fi-

nal determination of the department, the district court shall try the case de novo. "The decision of the district court shall be reviewable by the supreme court or the court of appeals as is otherwise provided by law." § 39–21–105(7), C.R.S.2009. Therefore, we defer to the district court's factual findings and will disturb them only if they are clearly erroneous and not supported by the record. *Bd. of County Comm'rs v. ExxonMobil Oil Corp.*, 192 P.3d 582, 585 (Colo.App.2008), *aff'd*, 222 P.3d 303 (Colo.2009). "We review de novo the court's application of the governing legal standards." *Id.* In addition, we review de novo an issue on which summary judgment was granted, as it is ultimately a question of law. *West Elk Ranch, L.L.C. v. United States*, 65 P.3d 479, 481 (Colo.2002).

### B. Statutory Construction

■ There is a "long-standing rule of statutory construction in this state that taxing powers and taxing acts will not be extended beyond the clear import of the language used, nor will their operation be enlarged by analogy." *Associated Dry Goods Corp. v. City of Arvada*, 197 Colo. 491, 496, 593 P.2d 1375, 1378 (1979). Thus, "[a]ll doubts will be construed against the government and in favor of the taxpayer." *Id.; see also ExxonMobil Oil Corp.*, 192 P.3d at 586 ("When interpreting tax statutes, a court should not view the power to impose taxes expansively, and should resolve doubts in favor of the taxpayer.").

■ However, this presumption is reversed when the taxpayer claims a statutory *exemption* from taxation. "Unless the statutes and the [C]onstitution place the property within a stated category of exemption, we resolve doubts regarding the meaning of statutes and the [C]onstitution in favor of subjecting the property to payment of its fair proportion of taxation." *Telluride Resort & Spa, L.P. v. Colo. Dep't of Revenue*, 40 P.3d 1260, 1264 (Colo.2002). Thus, "we presume that taxation is the rule and exemption from taxation is the exception." *Id.* "The taxpayer has the burden of proving entitlement to the exemption claimed." *Id.*

### C. Taxable Nature of Services

■ "[T]he purchase of personal services is generally not subject to taxation in Colorado. Rather, Colorado taxes the purchase of tangible personal property, valued by its sales price." *A.D. Store Co. v. Exec. Dir. of Dep't of Revenue*, 19 P.3d 680, 682 (Colo.2001). When a transaction combining delivery of services and tangible personal property products cannot be meaningfully separated into tangible and other-than-tangible components, we determine its taxable nature according to its "true object." *See City of Boulder v. Leanin' Tree, Inc.*, 72 P.3d 361, 363 (Colo.2003).

■ The department contends that the district court erred by concluding that the sales of fracturing services and materials were inseparable, and therefore application of the "true object" test is not necessary. It nonetheless argues that its special regulation 40, regarding taxation of service enterprises, is applicable here.

We agree with the district court that the fracturing transaction is inseparable and further agree that the "true object" of the transaction is to provide a service to taxpayer, not the sale of tangible personal property.

#### 1. Separability

In *A.D. Store*, the parties agreed that sales of altered garments were taxable transactions; the issue was whether only the garments themselves were taxable or the alteration services were taxable as well. The Colorado Supreme Court adopted the following test to determine the taxable nature of the transaction: "The test inquires whether the services and product are separable. If they are separable, then the service is not taxable." 19 P.3d at 684. The court concluded that the purchase of garments was separable from the purchase of alteration services, and therefore the alteration services were not independently taxable. *Id.*

The separability test as applied in *A.D. Store* is of limited benefit in deciding this case, however, because the parties here have agreed that the fracturing services themselves are *not* taxable. Moreover, it is clear from the invoices that the cost of fracturing

material is an allocable component of the transactions as the prices of the fluids and sands are separately set forth on at least some of the invoices. However, the issue here is whether the fracturing materials are "meaningfully separable" under the test set forth in *Leanin' Tree*, and therefore taxable.

In *Leanin' Tree*, 72 P.3d at 361–62, the court applied the separability test in a different context. Leanin' Tree manufactured greeting cards and other merchandise containing original artwork created by independent artists. *Id.* at 362. To obtain the artwork, Leanin' Tree licensed the original piece, a photographic negative of the original artwork, or a digital image on a computer disk of the original piece. *Id.* Leanin' Tree used the original artwork to create the merchandise, and it paid royalties to the artists based on sales of that merchandise. *Id.* The issue presented was whether sales tax was due on the licensing rights acquired by Leanin' Tree.

The court noted that "[t]he price of a purchase often includes a combination of tangible personal property[,] and services or rights that are other-than-tangible." *Id.* Citing *A.D. Store*, it stated, "If the price of the tangible property involved in a transaction can be *meaningfully separated* from the price commanded by the intangible portion of the transaction, the sales or use tax must be calculated on the purchase price of only the tangible property." *Id.* (emphasis added). In another sentence, the decision focused on whether the "various portions of the transaction," as opposed to the price commanded, are meaningfully separable. *Id.* The court determined that "the tangible and other-than-tangible portions of the transaction [by which the artist licensed the artwork to Leanin' Tree] were not meaningfully separable," because "[s]hort of simply separating the cost of raw materials" there was "no meaningful way to separate the value of the tangible medium from the value of the right to reproduce the image appearing on it." *Id.* at 364. Thus, although *Leanin' Tree* discusses the separability of the "price of the property involved," it ultimately concludes that whether a transaction qualifies as a sale of goods or services does not depend merely on the

separability of the costs of materials; rather, separability of the parts of the transaction and the value of those parts is determinative.

## 2. "True Object"

*Leanin' Tree* suggests that to determine whether a transaction or the value of its parts is separable, the proper analysis is to "identify characteristics of the transaction at issue that make it either more analogous to what is reasonably and commonly understood to be a sale of goods, or more analogous to what is generally understood to be the purchase of a service or intangible right." *Id.* at 366. This approach is described as the "totality of circumstances" or "true object" test, in that it seeks to identify the true object of the transaction. *See Waste Mgmt. v. City of Commerce City*, —— P.3d ——, ——, 2010 WL 1491648 (Colo.App. No. 09CA1083, April 15, 2010).

In *Leanin' Tree*, the court found the "true object" test was incorporated into the applicable Boulder tax regulation which provided:

> The test for determining whether a particular transaction involves a sale of tangible personal property or the transfer of tangible personal property incidental to the performance of a service is one of the true objects of the contract. If the true object sought by the buyer is the service per se, the transaction is not subject to tax even though some tangible personal property is transferred.

*Id.* at 363.

Similarly, the department's regulation applicable to service enterprises, which the department argues is applicable to the transactions at issue here, provides, in part, as follows:

> The basic distinction in determining whether a particular transaction involves a sale of tangible personal property or the transfer of tangible personal property incidental to the performance of a service is one of the *true objects of the contract;* that is, if the real object sought by the buyer is the service per se, the transaction is not subject to tax even [though] some tangible personal property is transferred.

SR–40, 1 Code Colo. Regs. 201-5 (emphasis added). Thus, according to this regulation, whether the transfer of property is "incidental to the performance of the service" depends on the true object of the transaction.

In *Leanin' Tree*, the court identified several factors relevant to determining the "true object" of a mixed transaction: (1) the value of the tangible property compared to that of the service; (2) whether there was an alternative method of transfer; (3) the length of time the intangible property, such as information, provided retains its value; (4) constraints on the buyer's ability to use the tangible property; (5) what is actually done with the tangible property after it has yielded its intangible component; (6) whether the tangible property represents the finished product sought by the buyer; and (7) the skill and expertise used to create the tangible property. 72 P.3d at 365–66.

To the extent these factors can be applied to a fracturing job, as opposed to the transfer of intellectual property analyzed in *Leanin' Tree*, we note that the relative value of the service is more than the price of the fracturing materials. The fracturing fluids have no value to the taxpayer after the services are performed and, as discussed below, the sands become an integral and inseparable part of the realty that taxpayer does not own. The fracturing company, not taxpayer, uses the fracturing materials, even though taxpayer must dispose of the waste. The tangible personal property once consumed is disposed of, not retained. The fractures, not the materials, are the finished product sought by taxpayer. The skill and expertise used to create the fracturing materials are not transferred, or even disclosed, to taxpayer.

In addition, irrespective of the "true object" test applied in *Leanin' Tree*, the department's special regulation 40, set forth above, incorporates a simplified "true object" test to determine the taxability of a mixed transaction based on one essential factor: if the real object sought by the buyer is the service per se, the transaction is not subject to tax even though some tangible personal property is transferred.

Here, for the reasons stated by the district court, we conclude that providing fracturing services, on the one hand, and using fracturing materials, on the other, are inseparable parts of the transactions at issue. Clearly, the true object of a fracturing transaction is to obtain fissures in the formation to enhance the productivity of the well, as the district court found, and not to obtain fracturing materials. The fracturing fluids are disposed of as waste by the taxpayer immediately following the service, and although the sand becomes a part of the realty, taxpayer does not "acquire" it because taxpayer does not own the land on which it operates the wells.

Our conclusion is buttressed by the decisions of courts in other jurisdictions that have analyzed whether fracturing services are taxable to the well operator by applying various versions of the "true object" test.

In *BJ–Titan Services v. State Tax Commission*, 842 P.2d 822, 828–29 (Utah 1992), the court concluded that sales taxes on fracturing services could not be collected from the well operator because

[t]he value to the [well operator] lies purely in the service, not in the chemicals, and there is no real transfer of possession or ownership of the chemicals. Therefore, the essence of BJ–Titan's fracturing and acidizing services is providing services, not tangible personal property, and the chemicals consumed in providing those services are merely incidental and thus not taxable.

Similarly, in *Dow Chemical Co. v. Department of Revenue*, 26 Ill.2d 283, 186 N.E.2d 333, 335 (1962), the court rejected imposition of a sales tax on stimulation treatments for oil and gas wells, concluding that "the actual nature of the transaction," not the method of billing, is determinative. The court reasoned that because "the customers in this case were not interested in acquiring chemicals, but in improving the production of their wells," the "chemicals sold have no independent value to the well operator except as a result of the service furnished by the [service provider]." *Id.* Further, "[i]t also seems clear that the treatments involve the utilization of special skill, knowledge and experience to accomplish the end result desired by the customer, and that the chemicals utilized are incidental

to the rendition of the service." *Id.* Likewise, in the instant case the district court found that a fracturing company generally recommends a fracturing treatment plan based on its "specialized skill and knowledge, laboratory data and tests and information regarding a particular well to be fractured."

In *Nowsco Well Service v. Revenue Cabinet,* 804 S.W.2d 10, 13 (Ky.Ct.App.1990), the court upheld the imposition of a use tax on the well service company, rejecting the imposition of a sales tax on the customers. The court described as "specious" the argument that sales tax should be imposed because the invoices list the supplies separately from the other charges. *Id.* at 12. The court noted that the evidence showed overwhelmingly "that the supplies are totally consumed by Nowsco while it performs its services. Nowsco does not sell its supplies to anyone other than to those who hire it to perform its well services." *Id.* Further, "[t]here was no evidence that [Nowsco] leaves any of its supplies with its customers or that its customers would need the supplies once Nowsco had performed its work at the site." *Id.* at 12–13. Here, too, the district court found that the fracturing fluids are proprietary and not generally available for purchase separately from the purchase of the services and that the spent fracturing fluids are a waste product.

Therefore, because the true object of hiring the fracturing companies was to receive a service, albeit a service that involved the use of fracturing fluids and sands, these are not sales transactions taxable to taxpayer.

### D. Tangible Personal Property

■ The department contends that the district court erred when it determined that the sand used by fracturing companies is not tangible personal property subject to sales tax because it is excluded from the definition of "tangible personal property." We agree with taxpayer and thus affirm the district court's ruling as an alternative ground for concluding that the sand is not taxable to taxpayer, even if it is transferred to taxpayer in the course of performing the service.

In Colorado, sales tax shall be collected and paid on "the purchase price paid or charged upon all sales and purchases of tangible personal property at retail." § 39–26–104(1)(a). "Tangible personal property" is defined as "corporeal personal property," § 39–26–102(15), and the parties do not dispute that sand is both tangible and corporeal in nature. Rather, the disagreement centers on the proper interpretation and application of the department's regulation 39–26–102.15, which provides an exclusion from the term "tangible personal property" in the following language:

> The term [tangible personal property] does not include real property, such as land and buildings, *nor tangible personal property that loses its identity when it becomes an integral and inseparable part of the realty, and is removable only with substantial damage to the premises.*

1 Code Colo. Regs. 201–4 (emphasis added).

The department contends that this exclusion from tax does not apply under the circumstances here, arguing that the regulation applies only when real estate which includes tangible personal property is sold and that it merely confirms that "tangible personal property that becomes a fixture and is later sold with real estate is not separately taxable." Taxpayer contends that fracturing sand is excluded from the definition of "tangible personal property," as the district court concluded.

Neither the department nor taxpayer provides any case authority interpreting the scope of the exclusion contained in this regulation. In its reply brief, the department cites *International Paper Co. v. Cohen,* 126 P.3d 222, 226 (Colo.App.2005), a case involving sales taxes assessed under Denver's municipal code upon equipment sold along with a paper plant. In passing, the division cited the state sales tax regulation 39–26–102.15, quoted above. The department argues that *Cohen* stands for the proposition that this regulation applies only in the context of determining the taxable nature of personal property when it is sold in a subsequent real estate transaction. However, even though the transaction in *Cohen* involved the sale of real estate and fixtures, the division did not limit application of the exclusion in the state regulation to any particular type of transaction.

The *Cohen* decision cites *Raynor Door, Inc. v. Charnes,* 765 P.2d 650, 650 (Colo.App. 1988), a case not cited by either party, in which the division considered whether a contractor was liable for sales taxes on custom-made garage doors it assembled and installed on customers' premises. The department argued that the contractor was liable for sales tax on the purchase price paid by its customers. The trial court found that, once installed, a custom-made garage door "loses its identity and becomes an integral and inseparable part of the realty." Although the trial court upheld the department's assessment of sales tax, a division of this court reversed, applying the exclusion at issue here.

The division concluded, based on the trial court's findings, that the garage doors are excluded from the definition of tangible personal property contained in the predecessor regulation to regulation 39–26–102.15 and are therefore not subject to sales tax under section 39–26–104(1)(a). The exclusion from sales tax in *Raynor* occurred under circumstances not involving the sale of real estate or the subsequent sale of fixtures attached to real estate. Thus, the application of the exclusion in that case is inconsistent with the department's suggested limitation on the exclusion in the regulation.

Based on regulation 39–26–102.15 and *Raynor,* we conclude that the sand, as it is used in the transactions at issue here, is excluded from the definition of "tangible personal property." There is no dispute with the district court's findings that the sand is used to keep the fractures open and improve production from the fractured formation and that to accomplish this purpose the sand remains embedded in the fractures. The sand thus becomes an integral and inseparable part of the real estate, and it is not removable without substantial damage to the property.

We conclude that the district court properly ruled that the sand is excluded from taxation under regulation 39–26–102.15, as it is not tangible personal property of taxpayer, and affirm that determination.[1]

### F. Separators

■ The department contends that the district court erred by concluding that the separators used by taxpayer to separate the well stream into water, liquid oil, and deliquified gas are exempt from taxation. We agree with the department.

Pursuant to section 39–26–709(1)(a)(II), "purchases of machinery or machine tools, or parts thereof, in excess of five hundred dollars to be used in Colorado directly and predominantly in manufacturing tangible personal property, for sale or profit" shall be exempt from taxation. "Machinery" is defined as "any apparatus consisting of interrelated parts used to produce an article of tangible personal property." § 39–26–709(1)(c)(II), C.R.S.2009. The department does not dispute that separators are machinery. "Manufacturing" is defined as "the operation of producing a new product, article, substance, or commodity different from and having a distinctive name, character, or use from raw or prepared materials." § 39–26–709(1)(c)(III), C.R.S.2009.

"As an exemption is a rare exception to taxation, the burden is on the taxpayer to establish the right to the exemption." *Broadmoor Hotel, Inc. v. Dep't of Revenue,* 773 P.2d 627, 629 (Colo.App.1989). "Any ambiguity in the language of the statute is to be construed against the taxpayer." *Id.*

Here, the separators merely sort the "well stream" into its three component parts: water, oil, and gas. To the extent that, once separated, these parts have distinctive names, characters, and uses, we conclude that these are differences of degree and not of kind. In this context, the "names" taxpayer urges us to adopt are merely self-serving labels. Taxpayer operates "oil" and "gas" wells—it does not drill for "well stream." Put another way, there is no raw material commonly known as "well stream." Indeed, taxpayer states that there is "no market" for

---

1. In an amicus brief, one of the service companies with whom taxpayer contracted, and on whom the burden for use tax may fall if taxpayer is successful here, argued that it properly collected the sales tax and paid the department pursuant to the department's regulation pertaining specifically to "contractors." We decline to address this argument because both taxpayer and the department expressed disagreement with the position advanced by the amicus. We express no opinion as to whether the fracturing materials may be taxable to a party other than taxpayer.

the well stream. Nor is the "character" or "use" of the well stream distinct from its component parts—taxpayer does not contend that the well stream has any character or use other than as a material to separate and sell.

Moreover, to the extent application of the statute's definition of "manufacturing" is uncertain in this case, we construe the tax exemption contained in the statute against taxpayer. Thus, we conclude that taxpayer failed to carry its burden to establish its right to an exemption with respect to the separators, and no refund is due for the separators.

### III. Conclusion

The district court's judgment is affirmed to the extent it determines that taxpayer is entitled to a refund of the sales tax it paid to fracturing companies, plus interest. The judgment is reversed to the extent it determines that the separators are exempt from taxation; no refund is due on this claim and the judgment must be amended to the extent it includes a refund for this claim. The case is remanded to the district court to amend the judgment consistently with this opinion.

Judge ROY and Judge DAILEY concur.